UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-

Case No. 10-20110
Hon: AVERN COHN

EDUARDO GAMEZ-SOTO,

    Defendant.

_____/

## MEMORANDUM

I.

On February 10, 2011, the Court for the reasons stated on the record denied the following motions:

> Motion to Suppress Evidence and Traverse Search Warrant
> and Suppress Evidence Derived Therefrom (Doc. 37)

and

> Motion to Suppress Wire Tap Evidence and Traverse Wire Tap
> Search Warrant (Doc. 38)

In its reasons for denying the motions, the Court stated that it would separately describe the particulars of the record which led to the conclusion that there was probable cause for issuance of the search warrant and probable cause justifying the wire interception.

The search warrant was issued out of the 19th District Court on January 26, 2011, under DEAI7-10-0004. The wire intercepts were approved by

> Order Authorizing The Interception Of Wire Communications

In The Matter Of The Application Of The United States of America For An Order Authorizing The Interception Of Wire Communications (Tracking No. 090-960088-F)

II.

The Court held evidentiary hearings on August 12, 2010, and November 30, 2010, on previously filed motions to suppress (Docs. 11 and 22). The motions to suppress (Docs. 37 and 38) were filed subsequent to the evidentiary hearings, and in substitution for the previously filed motions. The motions were denied on February 10, 2011 (Doc. 46).

III.

A summary of the evidence justifying the traffic stop, search of the Dodge Stratus and the search warrant follows.

1. On January 06, 2010, a district judge authorized interception of wire communication transmissions over a cellular telephone being utilized by Randolph Williams (Target Telephone 1).

2. On January 15, 2010, a second district judge authorized interception of wire communication transmissions over a second cellular telephone being utilized by Williams (Target Telephone 2). Target Telephone 2 was utilized by Williams following his utilization of Target Telephone 1.

3. Each wiretap was authorized based on probable cause as described in the affidavit in support that Williams and others named in the affidavit were engaged in illegal drug trafficking.

4. DEA agents began monitoring calls over each of the Target Telephones shortly after the interceptions were authorized. Calls intercepted and listened to were, among others, between Williams and an individual first identified as Unknown Male 342.

Unknown Male 342 was later identified as defendant. Defendant was using a telephone with the number 313-645-9199.

5. On January 20, 2010, agents secured a search warrant for global precision, location data for telephone number 313-645-9199. The data obtained led agents to the vicinity of Bedford Street in Dearborn Heights.

6. On January 21, 2010, agents observed an unidentified male leaving the residence at 4492 Bedford in a 2001 Dodge Stratus. The individual was later identified as defendant. Surveillance showed the individual entering a supermarket where he was overheard speaking Spanish, and on a telephone speaking some English.

7. During the course of surveillance of the Bedford address, agents observed a grey Ford Focus. A Hispanic male was observed coming out of the Bedford house, getting into the Focus and leaving. Shortly after, the unidentified male arrived at the house driving the Stratus.

8. Agents continued intermittent surveillance of the Bedford house for the next few days, as well as monitoring Williams' telephone calls. On January 24, 2010, at approximately 3:44 pm, agents intercepted a call placed by Williams to 313-645-9199. In the call Williams and the person he was speaking to agreed to meet.

9. At approximately 4:25 pm, a person was observed leaving the Bedford house and drive away in the Stratus. Agents lost surveillance of the Stratus because it was being driven very slow and in a manner which the agents believe was designed to avoid surveillance.

10. At 4:28 pm, Williams received a call from 313-645-9199. The conversation talked about meeting that night.

11. That evening the Stratus was observed arriving at the Bedford house and parking in the driveway. The Focus was then seen arriving at the Bedford house. The agents did not know how many people were in the house.

12. At 8:46 pm Williams called 313-645-9199. In the conversation which followed, Williams and the person he talked to agreed to meet at 2:00 am.

13. Sometime after 10:15 pm, a person carrying a flashlight moved in front of the Bedford house and opened the trunk of the Focus and appeared to be moving something inside the trunk. The person talked to someone at the door of the house and then drove off in the Focus.

14. At approximately 1:03 am on January 26, 2010, Williams talked to a person on telephone number 313-645-9199. The gist of the call was a meeting to take place at 2:00 am.

15. At approximately 1:35 am, motion was observed around the Stratus. Agent Brouillard notified other agents that someone had gotten into the Stratus and driven off. The agents still did not know if anyone was in the house.

16. Pursuant to prearrangement, a marked Dearborn Police car with two (2) uniformed officers was in the area. The Stratus was observed driving down side streets and then parking with the driver slumping down. After about a minute, the Stratus was restarted and seen driving erratically and going through stop signs.

17. At about 1:55 am, the decision was made by the agents to stop the Stratus. Dearborn Police officers Robert Price and Jarod Micalley, after observing the Stratus disregarding a stop sign, pulled it over for a traffic violation.

18.     Price approached the driver's side while Micalley approached the passenger side. As he approached the Stratus, Micalley saw the defendant who was driving the Stratus, talking on a cell phone. By the time Micalley got to the car, defendant had stopped talking.

19.     Price approached the Stratus with a flashlight. Price asked defendant for identification. Initially, defendant did not respond. After a minute, defendant produced, in Price's words, "some type of Passport and a Mexican ID." Price spoke English; defendant appeared to be responsive.

20.     When he approached the Stratus, Micalley observed a dark colored duffle bag on the floor behind the passenger seat. Micalley stayed at the car with defendant while Price went back to the police car with the identification.

21.     Price only ran the plate number for the car and later the driver's license for one of the occupants of the Ford Focus which arrived at the scene sometime after the stop of the Stratus.

22.     When he returned to the Stratus, Price asked Micalley if he had seen money "hanging out of the side of the bag" in the back seat. Price directed defendant to get out of the car; defendant complied. Price asked defendant a few questions; defendant responded. Price asked defendant for consent to search the car. Defendant said "okay."

23.     The DEA agents in the vicinity were advised of the duffle bag and currency. After defendant was placed in the Dearborn police car, Price returned to the Stratus. He did not remove the duffle bag.

24.     About five minutes after the stop, DEA Agent Grace arrived at the scene. He looked into the back seat and observed the duffle bag, which was then on the back seat

5

behind the driver's side.  Grace was told it originally was on the floor well of the back seat.  He saw the currency in a mesh pocket of the duffle bag.  Grace saw the open bag and inside duct taped bundles which he thought was narcotics.

25. Grace cut into one of the bundles; it contained currency.  The total currency in the duffle bag was $253,000.00.  Grace also checked the defendant's cell phone.  He verified that three (3) or four (4) calls had been made in the last ten (10) minutes.

26. About the time of the traffic stop, DEA Agent Brouillard, surveilling the Bedford house, noted lights going on and off.  He told the other agents about this.

27. Approximately thirty (30) minutes after the traffic stop defendant was taken to the Bedford house.  When asked if there was anyone in the house he said "no."

28. At the time defendant was brought to the Bedford house, the agents knew the lights were off initially, and had gone on shortly after the traffic stop.  They also knew defendant was on his cell phone when Price approached the Stratus.  They were also aware they had been unable to surveil the rear entrance to ascertain whether anyone had gone in or out of the house.

29. DEA Agent Martin determined that the agents should enter the house to secure it and prevent the destruction of potential drug evidence until a search warrant could be obtained.  Brouillard knocked on the front door and announced "police."  After a short period of time, he opened the front door with a key obtained from defendant.

30. The agents entering the house were told their purpose was to determine if anyone was in the house, and to secure and prevent destruction of evidence.  They were specifically told not to search beyond areas where there could be persons.

31.     Upstairs a woman and child were located.  In an upstairs bedroom Brouillard observed an open duffle bag in a closet.  The duffle bag appeared to contain cocaine.  The agent left the bag as it was.

32.     After the agents entered the house, defendant was brought in and seated on a couch in the living room.  Before seating defendant, the couch was searched; a pistol was found in one of the cushions.  It was not touched.  Defendant was seated in a chair.

33.     A search warrant was obtained from a magistrate of the 19th District Court. The search warrant authorized seizure of a variety of items typical of those found in a house with drugs.  In executing the search warrant the cocaine in the closet was retrieved.

IV.

A summary of the affidavit supporting the order authorizing the wire interceptions follows.

1.     The intercept was directed to Randolph Williams - 810-882-7313 (Target 2).

2.     There was probable cause to believe Williams engaged in drug trafficking.

3.     Williams initially used 313-258-1107 (Target 1).

4.     Third party telephone numbers contacted both Target 1 and Target 2.

5.     Drug traffickers commonly use two or more telephone numbers.

6.     Information has been obtained from DEA 1, i.e., a confidential informant who is reliable.

7.     DEA 1 identified Williams as a drug dealer; he has seen him receiving deliveries of drugs.

8.     DEA 1 identified Williams utilizing a telephone to contact potential customers.

9. DEA 1 had withdrawn dealing with Williams.

10. A detective with the River Rouge Police Department identified Williams as a drug dealer.

11. Calls to Target 2 have been identified as drug dealer calls.

12. Buendia, a known drug dealer, has been in contact with Williams.

13. Williams has been heard on Target 1 dealing in drugs.

14. Williams has been intercepted on Target 1 talking to Unknown Male 18 about drug dealing.

15. Williams has been heard trying to locate Target 2.

16. Multiple calls both to and from Target 2 have been identified.

17. "The interception of wire communications to and from Target 2 is necessary in this matter because normal investigative techniques have been tried and failed to fully achieve the objectives of this investigation, appear reasonably unlikely to succeed if tried, or are too dangerous to employ.  Interception of communications over both Target Telephones is necessary in this matter to enable the government to achieve the objectives, namely (1) to obtain direct evidence of the entire scope and personnel involved in the drug trafficking and money laundering conspiracy; (2) to identify the suppliers and importers of drugs and the facilitators and transporters of drug proceeds who assist the Target Subjects; (3) to identify the customers of the Target Subjects; (4) to identify stash locations where drugs and drug proceeds are stored; (5) to identify the methods by which drugs are brought to the Detroit, Michigan area and (6) to identify the methods by which drug proceeds are laundered."

18. Alternative investigatory techniques, such as

- Confidential Sources and Undercover Agents
- Consensual Recordings
- Physical Surveillance
- Pen Register Trap & Trace Devices; Call Analysis and Subscriber Information
- Search Warrants
- Interviews, Grand Jury Subpoenas and Immunity
- Police Reports and Arrest Records
- Trash Searches
- Use of Trafficking Devices
- Closed Circuit Televisions

have been insufficient.

19. Minimization requirements will be followed.


Dated: February 11, 2011

S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, February 11, 2011, by electronic and/or ordinary mail.

S/Julie Owens
Case Manager, (313) 234-5160